JOAN NEWNAM, Employee, Plaintiff v. NEW HANOVER REGIONAL MEDICAL CENTER, Employer, SELF-INSURED (ALLIED CLAIMS ADMINISTRATION, Servicing Agent), Defendant

No. COA10-905

(Filed 7 June 2011)

## 1. Workers' Compensation— occupational disease—carpal tunnel syndrome

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff's carpal tunnel syndrome was a compensable occupational disease. The testimony by plaintiff's expert witnesses was supported by competent evidence.

## 2. Workers' Compensation— temporary total disability— ability to earn wages

The Industrial Commission erred in a workers' compensation case by awarding plaintiff temporary total disability benefits. Plaintiff failed to meet the requirements of the first method of proof under *Russell*, 108 N.C. App. 762, since she presented no medical evidence that she was incapable of work in any employment following her surgery. Further, the case could not be remanded for additional findings because there was no medical evidence found in the transcripts to support this finding.

Judge HUNTER, Robert N., concurring in part and dissenting in part.

Appeal by defendant from Opinion and Award entered 3 May 2010 by the North Carolina Industrial Commission. Heard in the Court of Appeals 26 January 2011.

*Kathleen Shannon Glancy, P.A., by Terrie Haydu, for plaintiff-appellee.*

*Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by Kari A. Lee and Justin D. Robertson, for defendant-appellant.*

CALABRIA, Judge.

New Hanover Regional Medical Center ("defendant" or "NHRMC") and Allied Claims Administration appeal an Opinion and Award of the North Carolina Industrial Commission concluding that Joan Newnam ("plaintiff") suffered a compensable occupational disease and awarding her temporary total disability payments. We affirm in part and reverse in part.

NEWNAM v. NEW HANOVER REG'L MED. CTR.

[212 N.C. App. 271 (2011)]

## I. BACKGROUND

In 1999, plaintiff began working for defendant as a magnetic resonance imaging ("MRI") technologist. Plaintiff rotated to three different locations: NHRMC, Cape Fear Hospital ("Cape Fear"), and the "Medical Mall." The standard procedure for each location required two MRI technologists to be on duty at the same time. In addition, plaintiff was on-call four to six times per month at Cape Fear, and volunteered to work extra hours or shifts when any of the locations were understaffed.

Plaintiff's basic duties included performing MRI scans. For each patient receiving a scan, plaintiff was also required to scan paper documents and input data into defendant's computer system, move and instruct the patient for the scan, adjust the coil for the body part to be scanned, and conduct the MRI scan using a computer keyboard and mouse. Plaintiff performed between four and nine MRI scans per eight-hour shift, depending on whether she worked alone or if other MRI technologists were on duty. Each MRI scan lasted approximately 35 to 45 minutes. When plaintiff was the only MRI technologist on duty, she was responsible for all of these duties, but when other MRI technologists were on duty, the responsibilities were shared.

Each of plaintiff's three work locations had two separate work stations. One work station was used for ordering MRI studies, scanning paper documents, and inputting data into defendant's computer system. The second work station was for conducting the MRI scan. This second station had a large computer monitor, mouse, and keyboard. When plaintiff was engaged in her duties at the second work station, she constantly used the computer mouse and keyboard in order to adjust certain parameters associated with the MRI scan. The duration of plaintiff's duties at this second work station was between 16 seconds to several minutes.

In 2001, plaintiff reported to defendant that she experienced problems with tightness in her right shoulder and arm. On 22 March 2001, David Clawson ("Clawson"), an occupational therapist employed by defendant, performed an ergonomic assessment of plaintiff's work stations at NHRMC and the Medical Mall. According to Clawson, plaintiff's duties consisted of operating a computer 90 to 100 percent of the time, and the remaining 10 percent of her work duties involved transferring patients. Clawson recommended neck and shoulder stretches to help alleviate plaintiff's complaints of tightness in her right shoulder and arm. Clawson also recommended that

plaintiff obtain a foam or gel padded wrist rest on which to rest her fore-arms when using the computer and mouse. Plaintiff subsequently obtained a wrist rest and keyboard tray to provide support for her arms.

On 19 March 2004, plaintiff fell from an MRI mobile truck while working for defendant. She sustained injuries to, *inter alia*, her right thumb, left shoulder, and left wrist. Defendant accepted the compensability of plaintiff's injuries. Plaintiff sought treatment from Dr. Richard Moore ("Dr. Moore"), an orthopaedist with a subspecialty in hand surgery, and was unable to work for two to three weeks. Plaintiff subsequently returned to light duty work with defendant, which involved screening patients via telephone.

In October 2004, plaintiff reported to defendant that she experienced pain in her right shoulder, neck, and arm. On 13 October 2004, Clawson performed a second ergonomic assessment of plaintiff's work station at NHRMC. Clawson discovered that the height of plaintiff's desktop, combined with the face board under the desktop at her work station, prevented her from sitting close enough to the desk unless she lowered her chair. However, Clawson determined that if plaintiff lowered her chair, her elbows were too far below the desktop. Defendant allowed plaintiff to obtain a new chair which would suit plaintiff's needs at her work station.

On 20 August 2007, plaintiff obtained a "permanent" work assignment at the Medical Mall. Plaintiff's new duties required her to spend approximately 75 percent of her working hours at the Medical Mall, and the remaining 25 percent rotating between NHRMC and Cape Fear. Shortly after plaintiff began her new work assignment, she reported to defendant that she experienced pain in her right shoulder, trapezius, and arm as well as bilateral hand numbness, cramping, and tingling. Plaintiff reported to defendant that her pain began in the morning, increased throughout the day, and awakened her at night.

On 10 September 2007, Karla Santacapita ("Santacapita"), an occupational therapist employed by defendant, evaluated plaintiff's work station at the Medical Mall. Santacapita recommended the following: lowering the height of plaintiff's "desk area one" approximately one-and-one-half inches in order to allow for the proper angle of plaintiff's upper extremities to the keyboard and mouse; gel wrist rests for the keyboard and mouse; removing the drawers mounted under the desktop of "desk area two"; and either lowering the height of desk area two approximately three to four inches or, alternatively, providing plaintiff a foot stool and adjustable-height chair with

removable arm rests. Defendant accommodated some, but not all, of Santacapita's recommendations.

On 18 October 2007, plaintiff sought treatment from Dr. Moore for bilateral hand pain and bilateral hand numbness and tingling. Dr. Moore recommended a consultation with Dr. Patrick T. Boylan ("Dr. Boylan"), a pain management specialist, and also recommended that plaintiff obtain an ergonomic evaluation of her work stations. Plaintiff sought treatment on 30 November 2007 from Dr. Boylan for hand and wrist pain and numbness. Dr. Boylan's examination revealed that plaintiff suffered from moderate bilateral medial neuropathy at the wrist, consistent with moderate bilateral carpal tunnel syndrome. As a result of the examination, Dr. Boylan ordered conservative treatment including wrist splints for plaintiff to wear at night and use of pain medication.

On 7 February 2008, Dr. Moore agreed with Dr. Boylan's diagnosis of bilateral carpal tunnel syndrome, and discussed surgical options with plaintiff. Since Dr. Moore previously completed a Form 18M regarding plaintiff's 19 March 2004 work injury, he amended the Form 18M and indicated that plaintiff developed bilateral post-traumatic carpal tunnel syndrome as a result of her 19 March 2004 work injury and that plaintiff required surgery. Dr. Moore performed carpal tunnel injection therapy on plaintiff on 29 April 2008.

On 14 May 2008, plaintiff filed a Form 18 "Notice of Accident" with the North Carolina Industrial Commission ("the Commission" or "the Full Commission"), which defendant subsequently denied. On 27 May 2008, plaintiff reported relief of her carpal tunnel symptoms in her left hand, and elected to undergo carpal tunnel injection therapy in her right hand since it had become more symptomatic. Plaintiff reported improvement in her right hand following the second injection. On 21 August 2008, plaintiff filed a Form 33R and requested that her claim be assigned for a hearing.

On 24 November 2008, plaintiff returned to Dr. Moore, complaining of carpal tunnel symptoms in both hands. Plaintiff received bilateral carpal tunnel injections, with temporary relief. On 22 January 2009, plaintiff reported to Dr. Moore an exacerbation of her carpal tunnel symptoms due to increased activity. Dr. Moore recommended that plaintiff undergo limited open carpal tunnel release surgery, which plaintiff underwent on 11 March 2009. The surgery was successful. However, Dr. Moore did not release plaintiff to return to work.

On 30 September 2009, following a hearing, Deputy Commissioner Robert Harris entered an Opinion and Award concluding that plaintiff had not established that her employment caused or significantly contributed to her bilateral carpal tunnel syndrome, or placed her at an increased risk of developing carpal tunnel syndrome. Plaintiff appealed, and on 3 May 2010, the Full Commission entered an Opinion and Award concluding that plaintiff suffered a compensable occupational disease, and awarded her temporary total disability payments. Defendant appeals.

## II. STANDARD OF REVIEW

A party may appeal an Opinion and Award of the Full Commission "to the Court of Appeals for errors of law under the same terms and conditions as govern appeals from the superior court to the Court of Appeals in ordinary civil actions." N.C. Gen. Stat. § 97-86 (2009).

> Under the Workers' Compensation Act, "[t]he Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965). Therefore, on appeal from an award of the Industrial Commission, review is limited to consideration of whether competent evidence supports the Commission's findings of fact and whether the findings support the Commission's conclusions of law. *Adams v. AVX Corp.*, 349 N.C. 676, 681-82, 509 S.E.2d 411, 414 (1998). This "court's duty goes no further than to determine whether the record contains any evidence tending to support the finding." *Anderson*, 265 N.C. at 434, 144 S.E.2d at 274.

*Richardson v. Maxim Healthcare/Allegis Group*, 362 N.C. 657, 660, 669 S.E.2d 582, 584 (2008). "The facts found by the Commission are conclusive upon appeal to this Court when they are supported by competent evidence, even when there is evidence to support contrary findings." *Pittman v. International Paper Co.*, 132 N.C. App. 151, 156, 510 S.E.2d 705, 709 (1999). As an initial matter, defendant objected to Findings of Fact numbers 18, 24-27, 31, and 32 in the Full Commission's Opinion and Award. Findings of fact to which defendant does not object are binding. *Davis v. Harrah's Cherokee Casino*, 362 N.C. 133, 139, 655 S.E.2d 392, 395 (2008).

## III. COMPENSABLE OCCUPATIONAL DISEASE

**[1]** Defendant argues that the Full Commission erred by concluding plaintiff sustained a compensable occupational disease. More specifically, defendant contends that testimony by plaintiff's expert witnesses was unsupported by the evidence and "entirely based on conjecture, and therefore, not competent." Defendant then argues that since the testimonies were incompetent, that the Commission's findings based on their testimonies were not supported by competent evidence. We disagree.

> In the instant case, plaintiff's claim for carpal tunnel syndrome
>
> was filed under the catch-all disease provision of North Carolina's Workers' Compensation Act, which encompasses, "[a]ny disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment."

*Hassell v. Onslow Cty. Bd. of Educ.*, 362 N.C. 299, 305-06, 661 S.E.2d 709, 714 (2008) (quoting N.C. Gen. Stat. § 97-53(13) (2007)).

> [A] plaintiff worker satisfies the elements of this statute if she shows that her employment "exposed [her] to a greater risk of contracting [the] disease than members of the public generally, and [that] the . . . exposure . . . significantly contributed to, or was a significant causal factor in, the disease's development. This is so even if other non-work-related factors also make significant contributions, or were significant causal factors."

*Id.* at 306, 661 S.E.2d at 714 (quoting *Rutledge v. Tultex Corp./Kings Yarn*, 308 N.C. 85, 101, 301 S.E.2d 359, 369-70 (1983)).

> For a disease to be occupational under G.S. 97-53(13) it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [claimant's] employment."

*Rutledge*, 308 N.C. at 93, 301 S.E.2d at 365 (quoting *Hansel v. Sherman Textiles*, 304 N.C. 44, 52, 283 S.E.2d 101, 105-06 (1981)). "Plaintiff has the burden of proving that her claim is compensable under the Workers' Compensation Act and specifically here, that her

claim qualifies as an occupational disease." *Hassell*, 362 N.C. at 306, 661 S.E.2d at 714. "Evidence is insufficient on causation if it 'raises a mere conjecture, surmise, and speculation.' " *Phillips v. U.S. Air, Inc.*, 120 N.C. App. 538, 542, 463 S.E.2d 259, 262 (1995) (quoting *Hinson v. National Starch & Chem. Corp.*, 99 N.C. App. 198, 202, 392 S.E.2d 657, 659 (1990)).

> In cases involving "complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "However, when such expert opinion testimony is based merely upon speculation and conjecture, . . . it is not sufficiently reliable to qualify as competent evidence on issues of medical causation." *Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). "The evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation." *Gilmore v. Hoke Cty. Bd. of Educ.*, 222 N.C. 358, 365, 23 S.E.2d 292, 296 (1942) (discussing the standard for compensability when a work-related accident results in death).

*Holley v. ACTS, Inc.*, 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).

### A. Testimony of LeNeve Duncan

Defendant contends that the Full Commission's Findings of Fact 24, 25, 26, and 27, regarding deposition testimony offered by plaintiff's witness, LeNeve Duncan ("Duncan"), are unsupported by competent evidence. More specifically, defendant argues that Duncan's testimony was incompetent because: (1) she "admitted that her impression regarding [p]laintiff's contact stress was derived from photographs she took, not her actual observations"; (2) she "was the only person to testify that [p]laintiff's wrist postures were 'extreme' "; (3) that her measurements of plaintiff's wrist extension and impressions of contact stress were derived from the photographs; (4) that video footage of plaintiff performing her job duties rendered Duncan's photographs "not credible"; and (5) the video footage also contradicted Duncan's conclusion that plaintiff maintained poor posture at her work stations in order to always be in a "ready position" to use the computer.

Duncan, a licensed physical therapist with twenty-two years' experience in ergonomics, testified that she authored a report which

detailed her ergonomic analysis of plaintiff's work duties at all three worksites. She further testified that when she performed her analysis, she relied on her observation of plaintiff, conversations with plaintiff, videotapes and photographs that she personally took, measurements she made, and documents she reviewed. She also testified that she derived her opinion regarding plaintiff's contact stress based on personal observation.

While Duncan was the only witness who testified that plaintiff's wrist postures were "extreme," the Full Commission did not rely on this statement in making its findings and conclusions. Duncan testified that she used a rapid upper limb assessment ("RULA") to measure plaintiff's posture, force, and muscle work for her upper extremities and cervical spine. She also testified that contact pressure and posture, including wrist extension postures, are factors to be considered when performing an ergonomic analysis. She further testified that each of plaintiff's worksites caused plaintiff thirty to fifty degrees of wrist extension, which is a deviation from a neutral position, and that when the wrist extension varies from neutral, the person experiences increased pressure in the carpal tunnel, which causes carpal tunnel inflammation and carpal tunnel syndrome. Duncan stated that plaintiff had poor posture. Although the computer monitors at all three worksites were not at the correct height, each computer's mouse was not the correct type. In addition, the desk edges were too sharp, and the chairs did not provide elbow support. Duncan also stated that plaintiff experienced contact pressure and wrist extension at all three worksites. Duncan's testimony was clearly based on her own observations of plaintiff's worksites, as well as her observations of her own photographs and videotapes.

Defendant argues that Duncan's photographs were not credible because defendant's ergonomic expert, Alex Arab ("Arab"), testified that he "saw a couple" of photographs which "were not consistent" with what he observed. However, the trial court's uncontested finding states that Arab "did not personally observe [p]laintiff at her other work locations at which she spent 25 percent of her time[.]" Furthermore, Duncan testified that she videotaped her evaluation of plaintiff's worksites at the same time as defendant's videographer, and that she took photographs during taping. In addition, both Dr. Moore and defendant's medical expert, Dr. George Edwards ("Dr. Edwards"), testified that the postures and positions plaintiff demonstrated in the photographs were consistent with and were accurate representations of her daily work duties.

Defendant contends that the video footage shows plaintiff "continuously moved throughout her tasks, and was not always in the 'ready position.' " However, Duncan testified that plaintiff maintained poor posture because her hands were "always . . . in ready [position.]" Plaintiff testified that work station two required constant use of the mouse and keyboard in order to adjust certain parameters associated with the MRI scan. Debra Carter ("Carter"), plaintiff's supervisor, and Susan Britt ("Britt"), a coworker of plaintiff, corroborated plaintiff's testimony. Carter also testified, "When you are scanning, you are constantly putting in perimeters [sic], using the mouse and typing on the keyboard."

## B. Testimony of Dr. Moore

In addition to disputing Duncan's testimony, defendant also contends that the Full Commission's Findings of Fact 31 and 32, regarding Dr. Moore's deposition testimony, are unsupported by competent evidence. Specifically, defendant argues that Dr. Moore's testimony was incompetent because it was based on Duncan's photographs and was unsupported by the video footage, and defendant supports its argument by citing testimony from Arab and Edwards, and findings made by the Deputy Commissioner.

As an initial matter, the Full Commission reviews appeals from the Deputy Commissioner *de novo*. Therefore, the Deputy Commissioner's findings are irrelevant and have no bearing on the instant case. *See Watkins v. City of Wilmington*, 290 N.C. 276, 280, 225 S.E.2d 577, 580 (1976) ("[I]n reviewing the findings found by a deputy commissioner . . ., the Commission may review, modify, adopt, or reject the findings of fact found by the hearing commissioner."). Furthermore, the Full Commission's unchallenged findings show greater weight was given to the testimony of Duncan and Moore over that of Arab and Edwards. Therefore, defendant's arguments for this Court to "re-weigh" the evidence are overruled. *See Hassell*, 362 N.C. at 307, 661 S.E.2d at 715 (On appeal from a decision by the Full Commission, "this Court may not re-weigh the evidence, given that the Commission has already weighed the evidence, as is its role under statute.").

Dr. Moore had been plaintiff's treating physician since 2004, when she suffered compensable work-related injuries after she fell from a MRI mobile truck. On 18 October 2007, plaintiff sought treatment from Dr. Moore for carpal tunnel symptoms, including bilateral hand numbness and tingling. Dr. Moore recommended an ergonomic

evaluation of plaintiff's workstations and a consultation with Dr. Boylan.

On 30 November 2007, Dr. Boylan performed nerve conduction studies of plaintiff's hands. Dr. Boylan's studies revealed moderate bilateral median neuropathy at plaintiff's wrists, and he prescribed wrist splints for her to wear at night. On 7 January 2008, plaintiff reported to Dr. Boylan that she had been wearing her splints at night without relief. Dr. Boylan recommended an MRI of plaintiff's cervical spine. Following the MRI of her spine, plaintiff reported to Dr. Moore on 7 February 2008. After examining the MRI, Dr. Boylan's studies, and his own medical notes, Dr. Moore's diagnosis of plaintiff's condition was carpal tunnel syndrome. Dr. Moore then amended the Form 18M, which previously indicated that plaintiff was at risk for post-traumatic arthritis, by adding that plaintiff developed post-traumatic carpal tunnel syndrome which required surgery.

Plaintiff followed Dr. Boylan's recommendations and underwent physical therapy from 18 April through 23 July 2008. On 29 April 2008, Dr. Moore performed a carpal tunnel injection to plaintiff's left wrist, which brought plaintiff temporary relief. Plaintiff underwent the same procedure on her right wrist on 27 May 2008. However, plaintiff returned to Dr. Moore on 24 November 2008 with recurring carpal tunnel symptoms. Dr. Moore performed two additional carpal tunnel injections, but on 22 January 2009, Dr. Moore stated that plaintiff required surgery.

Dr. Moore performed bilateral open carpal tunnel releases on 11 March 2009, removed plaintiff's sutures on 23 March 2009, and gave instructions regarding scar massage, along with range-of-motion and strengthening exercises. Following the surgery, Dr. Moore did not release plaintiff at maximum medical improvement or assign her a disability rating.

Dr. Moore was deposed twice in the instant case regarding his treatment of plaintiff. In his first deposition on 29 July 2008, he testified that he made a mistake on the second Form 18M that was filed with the Commission. Dr. Moore explained that after revising his medical notes, he determined that plaintiff's bilateral carpal tunnel syndrome was not related to her 2004 injury, but was caused by her employment duties. He also testified that plaintiff's job duties were similar to those of a transcriptionist. Dr. Moore further stated that, to a reasonable degree of medical certainty, plaintiff's employment history with defendant placed her at a greater risk of contracting bilateral

carpal tunnel syndrome than the general population not equally exposed.

Approximately one month after plaintiff's 11 March 2009 surgery, Dr. Moore was deposed a second time. Prior to his second deposition, unlike his first deposition, Dr. Moore reviewed DVDs of plaintiff's work stations; ergonomic evaluations by Duncan and Arab; Dr. Edwards' deposition; and the testimony from the hearing before the Deputy Commissioner. Dr. Moore testified that carpal tunnel syndrome was a compressive neuropathy of the median nerve at the wrist leading to dysfunction, pain, numbness, tingling and weakness. He testified that contact pressure increased the pressure localized on the carpal tunnel nerve, thereby increasing the pressure on the median nerve and contributing to the development of carpal tunnel syndrome.

Dr. Moore testified that wrist postures increased the pressure in the carpal tunnel and that, based on his review of the videos and photographs of plaintiff performing duties in the scope of her employment, plaintiff's duties put her at risk for developing carpal tunnel syndrome. Based on Dr. Moore's review of these materials, his evaluation, training, education, and experience, Dr. Moore stated to a reasonable degree of medical certainty that plaintiff's employment history with defendant caused her carpal tunnel syndrome. Furthermore, Dr. Moore determined that, based on a number of occupational factors, including sharp desk edges, improper desk heights, immovable arm rests on plaintiff's chairs, and difficulty positioning the chairs, plaintiff's employment duties subjected her to a greater risk of developing carpal tunnel syndrome "than the general public not equally exposed" to these factors. Dr. Moore also testified that he based his opinions on several factors, including plaintiff's complaints of bilateral hand numbness and tingling, her medical history, and the ergonomic evaluations by Santacapita, Duncan, and Arab.

Since Dr. Moore was plaintiff's treating physician since 2004, he was in the best position to understand plaintiff's job duties. His opinions were predicated on accurate impressions of plaintiff's job duties and activities. In addition, his deposition testimony is supported by competent evidence. Findings 31 and 32 by the Full Commission that were based on Dr. Moore's testimony are therefore supported by competent evidence.

## IV. TEMPORARY TOTAL DISABILITY BENEFITS

**[2]** Defendant argues that the Full Commission erred by awarding plaintiff temporary total disability benefits. We agree.

> In order to obtain compensation under the Workers' Compensation Act, the claimant has the burden of proving the existence of his disability and its extent. *Hilliard v. Apex Cabinet Co.*, 305 N.C. 593, 290 S.E.2d 682 (1982); *Hall v. Chevrolet Co.*, 263 N.C. 569, 139 S.E.2d 857 (1965). In cases involving occupational disease, N.C.G.S. § 97-54 provides that "disablement" is equivalent to "disability" as defined by N.C.G.S. § 97-2(9). *Booker v. Medical Center*, 297 N.C. 458, 256 S.E.2d 189 (1979). N.C.G.S. § 97-2(9) defines "disability" as the "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." To support a conclusion of disability, the Commission must find: (1) that the plaintiff was incapable after his injury of earning the same wages he earned before his injury in the same employment, (2) that the plaintiff was incapable after his injury of earning the same wages he earned before his injury in any other employment and (3) that the plaintiff's incapacity to earn was caused by his injury. *Hilliard*, 305 N.C. at 595, 290 S.E.2d at 683.

*Hendrix v. Linn-Corriher Corp.*, 317 N.C. 179, 185-86, 345 S.E.2d 374, 378-79 (1986).

> The burden is on the employee to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment, [] (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment, [] (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, *i.e.*, age, inexperience, lack of education, to seek other employment, [] or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.

*Russell v. Lowes Product Distrib.*, 108 N.C. App. 762, 765-66, 425 S.E.2d 454, 457 (1993) (internal citations omitted).

In *Terasaka v. AT&T*, the Full Commission concluded, *inter alia*:

(1) "plaintiff developed bilateral carpal tunnel syndrome, an occupational disease, due to causes and conditions characteristic of and peculiar to her employment that was not an ordinary disease of life to which the general public is equally exposed"; (2) plaintiff proved "that she was temporarily totally disabled from 13 March 2002, less four days, and continuing thereafter"; (3) "plaintiff is entitled to receive total disability benefits in the weekly amount of 502.36 from 13 March 2002, less four days, and continuing until further order of the [Commission]"[.]

174 N.C. App. 735, 737-38, 622 S.E.2d 145, 148 (2005), *aff'd per curiam*, 360 N.C. 584, 634 S.E.2d 888 (2006). The Commission also concluded that "[a]s of 13 March 2002, plaintiff was *unable to work in any capacity* due to her carpal tunnel syndrome and, except for four days when she later attempted to return to work, plaintiff remained disabled." *Id.* at 739, 622 S.E.2d at 148-49 (emphasis original). On appeal, our Court held that the Commission's findings were supported by competent evidence. *Id.* at 739-40, 622 S.E.2d at 148-49. Furthermore, we concluded:

Since the Commission conclusively found "plaintiff was unable to work in any capacity due to her carpal tunnel syndrome," the only *Russell* prong applicable on these facts is the first prong. . . . While we agree that a plaintiff can ordinarily prove disability under any of the four *Russell* prongs, [], on these particular facts, the Commission's finding [] is conclusively established and precludes us from considering any of the other *Russell* prongs.

Thus, under the only *Russell* prong applicable on these facts, in order for plaintiff to meet her burden of proving disability, she had to produce *medical evidence* that she is physically or mentally, as a consequence of the work related injury, incapable of work in *any* employment.

*Id.* at 740, 622 S.E.2d at 149 (emphases original and internal citations omitted). We then held that the Commission's finding "that the medical evidence merely showed 'plaintiff could not return to any job which required repetitive motion of the hands and wrists' . . . does not amount to a finding that plaintiff could not work in *any* employment." *Id.* (emphasis original).

In the instant case, the Full Commission found:

18. On March 11, 2009, Plaintiff underwent bilateral carpal tunnel release surgery performed by Dr. Moore, which was successful. As of the date of the close of the record before the Deputy Commissioner, Dr. Moore had yet to release Plaintiff to return to work, and she was not at maximum medical improvement.

The Full Commission then concluded, in pertinent part:

4. As a result of Plaintiff's occupational disease of bilateral carpal tunnel syndrome, Dr. Moore removed her from work on March 11, 2009 due to her surgery and has not released her to return to work. Therefore, Plaintiff has established that she has been medically disabled and unable to earn wages in any employment from March 11, 2009, and continuing. Plaintiff is entitled to temporary total disability compensation at the rate of $754.00 per week from March 11, 2009 through the present and continuing until further order of the North Carolina Industrial Commission.

Therefore, the Full Commission focused on the fact that Dr. Moore never released plaintiff to return to work as support for its conclusion that plaintiff established disability under the first prong of *Russell*. However, a finding that a doctor never released a plaintiff to return to work is insufficient to establish disability under the first prong of *Russell*. *See Parker v. Wal-Mart Stores, Inc.*, 156 N.C. App. 209, 212, 576 S.E.2d 112, 114 (2003) (holding Commission's findings were insufficient to support determination of disability where "the Full Commission merely found that [plaintiff's doctor] had not released plaintiff to return to work after her surgery even though she retained the ability to perform a range of activities that may or may not have allowed her to earn her pre-injury wages . . . .").

Finding of Fact 18 "conclusively established" that Dr. Moore had not released plaintiff to return to work. Therefore, while plaintiff could ordinarily prove disability under any of the four *Russell* prongs, the Full Commission's finding precludes us from considering any of the other prongs, and plaintiff was required to present medical evidence that she was physically or mentally unable to work in any employment as a result of her work-related injury. The Full Commission's Finding of Fact 18 simply established that Dr. Moore had not yet released plaintiff to return to work at her present employment. However, this finding "does not amount to a finding that plain-

tiff could not work in any employment." *Terasaka,* 174 N.C. App. at 740, 622 S.E.2d at 149. As such, it is insufficient to establish that plaintiff could not obtain any employment due to her work-related injury. *See, e.g., Ramsey v. S. Indus. Constructors Inc.,* 178 N.C. App. 25, 42, 630 S.E.2d 681, 692 (2006) (concluding medical evidence was insufficient to establish disability under *Russell's* first prong when doctor's testimony showed only that, due to injury, plaintiff could not lift objects over his head, suffered partial permanent loss of the use of his right arm, and was "more disabled than he would otherwise be as a result of the injury" due to congenital problems with his left arm).

Therefore, this finding of fact—and indeed the evidence in the record—is insufficient to support a conclusion that plaintiff met her burden as to the first prong of *Russell.* Plaintiff has not met the requirements of the first method of proof under *Russell* since she presented no medical evidence that she was incapable of work in any employment following her surgery on 11 March 2009. *See Britt v. Gator Wood, Inc.,* 185 N.C. App. 677, 684, 648 S.E.2d 917, 922 (2007) ("Plaintiff has not met the requirements of the first method of proof under *Russell* since he presented no medical evidence that he was incapable of work in *any employment* during the period of 13 January 2003 to 7 February 2003.") (emphasis original).

"Moreover, we cannot remand for additional findings because the transcripts reveal no medical evidence that could support a finding that plaintiff was incapable of work in any employment." *Terasaka,* 174 N.C. App. at 741, 622 S.E.2d at 149. At his second deposition on 14 April 2009, Dr. Moore testified as follows:

Q: At this point [plaintiff's] restrictions and limitations, is she still currently out of work related to the surgery?

A: I don't—I don't believe she's out of work with regards to the surgery anymore, but I can't tell you that definitively unless I have that specific note in front of me.

. . .

Q: Okay. And so at this point you can't recall without seeing the notes exactly what's happened in terms of [plaintiff]?

A: With regards to the specific work release, that's correct.

Q: But [plaintiff] would have been out of work post surgery for some period of time?

A: Yes.

Q: And that should be noted in your notes that you think we should be able to get?

A: Yes.

However, the only evidence in the record regarding Dr. Moore's post-surgical care of plaintiff is a report dated 23 March 2009, twelve days after plaintiff's surgery, in which Dr. Moore reported that plaintiff was doing "very well" and wanted to perform range-of-motion, strengthening, and scar massage exercises on her own. The report does not reference plaintiff's employment status, nor does it state that Dr. Moore excused plaintiff from performing her work duties, or that she was incapable of work in any employment.

Accordingly, because plaintiff failed to meet her burden of establishing disability under *Russell*, we hold the Full Commission erred in concluding that plaintiff "established that she has been medically disabled and unable to earn wages in any employment from March 11, 2009, and continuing." *See id.* Furthermore, the Commission's award of temporary total disability payments based on this conclusion "was likewise in error," and we reverse that portion of the opinion and award of the Commission. *Id.*

## V. CONCLUSION

The portion of the Full Commission's Opinion and Award awarding plaintiff temporary total disability benefits is reversed. We affirm the Opinion and Award in all other respects.

Affirmed in part and reversed in part.

Judge STROUD concurs.

Judge HUNTER, JR., Robert N., concurs in part and dissents in part by separate opinion.

HUNTER, Jr., Robert N., Judge concurring in part and dissenting in part.

I concur with the majority opinion based upon this Court's opinion in *Parker v. Wal-Mart Stores, Inc.*, 156 N.C. App. 209, 212, 576 S.E.2d 112, 114 (2003). I would reverse and remand this matter to the Industrial Commission, however, for further findings of fact on the remaining three *Russell* factors for establishing temporary total disability. 108 N.C. App. at 765-66, 425 S.E.2d at 457.